UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff-Respondent,

v.

CORNELIUS PATTON (D-2),

    Defendant-Petitioner.

                                       /

Case No. 15-20246

Honorable Nancy G. Edmunds

**ORDER DENYING DEFENDANT-PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [165]**

## I. BACKGROUND

On October 28, 2015, Defendant- Petitioner Cornelius Patton was charged in a Superseding Indictment with Conspiracy to Possess with Intent to Distribute Controlled Substances. (Dkt. #42). On February 29, 2016 Defendant entered a guilty plea, pursuant to a Rule 11 plea agreement, to one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846. On June 28, 2016, the Court sentenced Defendant to a 60-month term of imprisonment. The judgement was amended on June 30, 2016 for the purpose of adding Defendant's date of birth and social security number, and to specify that he would self-surrender to the U.S. Marshal. On July 7, 2017, Defendant filed a timely *pro se* motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, arguing that Defense Counsel was ineffective. The Government filed a response on October 3, 2017 (Dkt. # 184), and Defendant filed a reply on November 20, 2017 (Dkt. # 193). For the reasons set forth below, the Court DENIES Defendant's motion.

## II. FACTS & PROCEDURAL POSTURE

On January 30, 2015, Defendant was pulled over for tailgating another vehicle on I-94 while passing through Van Buren County, MI at approximately 12:20 PM. (Dkt. # 184-2, Pg ID 948-49; Dkt. # 193, Pg ID 1288-89). Defendant was the driver of a vehicle owned by passenger and co-defendant Charles Brown. The attending officer was Trooper John Moore of the Michigan State Police ("MSP"). (Dkt. # 184-2, Pg ID 948). He detected a strong odor of air freshener coming from the vehicle. *Id.* at Pg ID 949. Upon questioning, Defendant informed Moore that passenger Brown and he were returning from Chicago and heading toward Detroit. (Dkt. #184-2, Pg ID 949). The details of their story, as to the length of their stay, began to vary during Moore's questioning from one week, to two days, to a day and a half. *Id.*; Dkt. # 193, Pg ID 1294. Moore asked for driver's licenses and registration and insurance paperwork for the vehicle. (Dkt. # 184-2, Pg ID 949). Moore noted that Defendant and Brown were nervous due to Defendant's wide eyes, Defendant's excited demeanor, and Brown's shaking hands while handing over car insurance and registration documents. (Dkt. #193, Pg ID 1291; Dkt. # 184-2, Pg ID 949). Moore further noted that, after some time fumbling around the glovebox, Brown handed him an incorrect insurance certificate for another vehicle and a registration to the vehicle's previous owner. (Dkt. # 184-2, Pg ID 949; Dkt. # 193, Pg ID 1293). Moore also had to approach the vehicle a second time to obtain Brown's driver's license because he did not furnish it at first request. *Id.* At a preliminary examination for the initial state offenses, Moore described that both parties' body language led him to believe that this was not a "regular traffic stop." (Dkt. # 193, Pg ID 1291).

After verifying the documents, Moore asked Defendant to exit the vehicle for further questioning to clarify the inconsistencies in the story about the Chicago trip and to get an unbiased statement from Defendant. *Id.* at Pg ID 1317, 1336. Moore testified that Defendant asked irregular questions, such as, "Is this a regular traffic stop?" and, "Why can't you just give me a ticket?" (Dkt. # 184-2, Pg ID 950; Dkt. # 193, Pg ID 1296). Moore asked Defendant where his luggage was for his trip, and he indicated that it was in the trunk. (Dkt. # 184-2, Pg ID 950). Moore then asked Defendant if he had anything in the vehicle that was his, and Defendant said no. *Id.* Moore requested and was denied consent to search the vehicle. *Id.*; Dkt. # 193, Pg ID 1297. At the preliminary examination, Moore testified that based on his training and expertise, the inconsistencies in Defendant and Brown's story, their unusually defiant demeanors, Defendant's unusual questions, and the furnishing of incorrect documents, he believed that criminal activity was afoot. (Dkt. # 193, Pg ID 1296, 1328, 1332, 1341).

Upon request by Moore, at around 12:30 PM, approximately ten minutes after Moore stopped the vehicle, Trooper Michael Sinke arrived at the scene with a K-9 unit (Dkt # 184-3, Pg ID 957; Dkt. # 193, Pg ID 1336-37, 1354). Sinke arrived as Moore was asking Brown to step out of the car for further questioning. (Dkt. # 193, Pg ID 1298, 1354). Sinke and Canine Murph conducted a free air sniff of the vehicle's perimeter, and the dog gave a positive indication of narcotics odor in the vehicle. (Dkt. # 184-2, Pg ID 950; Dkt. # 184-3, Pg ID 957; Dkt. # 193, Pg ID 1299). Defendant and Brown were then detained. (Dkt. # 184-2, Pg ID 948). A later search of the vehicle revealed 2.5 kilograms of cocaine and over 25 grams of heroin in a secret compartment inside the vehicle. *Id.* Defendant

and Brown were not issued a traffic ticket or warning for the tailgating violation. (Dkt. # 193, Pg ID 1306).

Prior to the January 30, 2015 vehicle stop, MSP communicated with agents at the U.S. Drug Enforcement Administration ("DEA") regarding an ongoing, long-term DEA investigation. (Dkt. # 184-4, Pg ID 959). Since August 2013, DEA agents had been investigating Theodore Chandler, a co-defendant in this case, and his drug trafficking organization. (Dkt. # 184-5, Pg ID 963-64). In November 2013, Chandler had negotiated the purchase of one kilogram of heroin with a Homeland Security investigator, but Chandler escaped before agents were able to arrest him. *Id.* Kenyatta Hooks, the individual holding the money for this transaction was arrested and found to be in possession of $37,500.00 as well as driving a vehicle outfitted with an aftermarket hidden compartment. *Id.* at Pg ID 964. DEA agents were also aware that Chandler had been intercepted during court authorized wire taps discussing narcotics trafficking with individuals in Colombia and Detroit. *Id.*

Two days before Defendant's arrest, on January 28, 2015, a confidential informant notified DEA agents that Chandler planned to purchase a large quantity of cocaine in Phoenix, AZ. *Id.* at Pg ID 965. The informant also reported that a courier would transport the drugs in a car with a secret compartment. *Id.* The informant had been used by the DEA in the past, with his/her information furthering investigations and prosecutions, and leading to seizures of large amounts of drugs and currency. *Id.* The informant's tip was corroborated by DEA agents' findings on social media pages of individuals associated with Chandler. *Id.* at Pg ID 965-66. Particularly, a known associate of Chandler posted a photograph of the weather forecast in Phoenix. *Id.* Agents also observed photos of

Defendant and other associates of Chandler holding large amounts of U.S. currency. *Id.* at Pg ID 966. Other posts included messages denoting travel to Arizona and a photograph of the University of Phoenix Stadium. *Id.* Through a video posted on an undercover Instagram account, agents were able to identify the lobby of the Embassy Suites Hotel in Phoenix, wherein agents were granted access to review surveillance footage showing the front desk. *Id.* at Pg ID 967. The footage depicted Defendant, Hooks, and a third unidentified individual checking into the hotel on January 26, 2015. *Id.*

An administrative subpoena to obtain information on the individuals who rented the hotel room led to the identification of Roderic Graham of Southfield, MI, with phone number (248)-974-9258 used at check-in. *Id.* The DEA was granted a search warrant for the location of this phone, which had been in communication with another target cellphone number believed to be used by Chandler. (Dkt. # 184-4, Pg ID 959). On January 30, 2015, at around 10:00 AM, Detroit DEA agents reviewed the electronic surveillance and geo-location information pertaining to this phone. *Id.* As the phone approached Michigan, the DEA group supervisor contacted MSP Trooper Jose Patino to inform him of the investigation and findings from the phone's geo-location and asked MSP to perform a traffic stop. *Id.* At approximately 12:24 PM, DEA Agent Samaniego was notified by MSP Trooper Sargent Dragomer that MSP troopers were conducting the traffic stop involving Defendant, discussed above. *Id.* at 960.

Defendant and Brown were arrested on state drug charges, which were dismissed in lieu of federal prosecution. (Dkt. #165, Pg ID 855). An indictment was filed in the United States District Court for the Eastern District of Michigan on April 23, 2015 charging Defendant with Conspiracy to Possess with Intent to Distribute Controlled Substances

pursuant to 21 U.S.C. §§ 846 and 841 (a)(1). (Dkt. # 1). On February 29, 2016, Defendant pled guilty to the charge (Dkt. # 65), and on June 27, 2016, the Court sentenced Defendant to 60 months in prison (Dkt. # 104).

In his motion, Defendant now claims that his attorney was ineffective by failing to file a motion to suppress the drugs that were seized after the vehicle stop on January 30, 2015, and that Defendant would not have pled guilty had Defense Counsel filed a successful motion to suppress. (Dkt. # 165). According to Defendant, Defense Counsel initially advised him that the MSP troopers had violated his Fourth Amendment rights "because the traffic stop improperly escalated into a criminal investigation using the drug-dog to sniff the vehicle without probable cause or reasonable suspicion." *Id.* at Pg ID 855. Defendant claims that Defense Counsel told him that he would file a motion to suppress the evidence on the basis of illegal search and seizure. *Id.* at Pg ID 856. Defendant states that Defense Counsel later advised him that, after researching the law, he no longer believed that there was a legal basis to challenge the search. *Id.* at Pg ID 857. Defense Counsel "explained that the troopers could order Mr. Brown and me to exit the vehicle as part of the traffic stop, and permit the drug-dog to sniff the vehicle without violating our Fourth Amendment rights." *Id.* Defense Counsel advised that Defendant had no viable defense for trial without the suppression defense. *Id.* Defendant pled guilty based on this advice from his attorney. *Id.* at Pg ID 858.

III. **STANDARD OF REVIEW**

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." To prevail on a Section 2255

motion, the petitioner must allege: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003) (internal quotation marks omitted). Section 2255 motions filed *pro se* are liberally construed. *See Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993).

Under the Sixth Amendment, a defendant has a right to "have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. In *Strickland v. Washington*, the Supreme Court determined that a defendant has a right to "reasonably effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). It articulated a two-prong test to show ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown of the adversary process that renders the result unreliable.

*Id.* Courts must be "highly deferential" when evaluating counsel's performance. *Id.* at 689; *see also Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993). "There is a strong presumption that legal counsel is competent." *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989).

As to the first requirement of the *Strickland* test, the defendant bears the burden of showing that counsel's errors were so objectively unreasonable that he or she did not act in accordance with the Sixth Amendment guarantee. *Strickland*, 466 U.S. at 687. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective

7

at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).

The second prong of the *Strickland* test requires that the Defendant show with reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When a defendant alleges that ineffective counsel led to the acceptance of a plea agreement, the defendant demonstrates prejudice by showing that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

In sum, the defendant bears the burden of showing that defense counsel's performance was so deficient and that prejudice resulted from defense counsel's error. *Strickland*, 466 U.S. at 686-87.

## IV.   ANALYSIS

Where the principal allegation for ineffective assistance is defense counsel's failure to competently litigate a Fourth Amendment claim, the defendant bears the burden of also proving that the claim is meritorious and that there is reasonable probability that the result of the proceeding would have been different absent the excludable evidence. *See Kimmelman*, 477 U.S. at 375. The Court now turns to the merits of Defendant's Fourth Amendment claim.

The Fourth Amendment provides that the people have a right to be secure in their "persons, houses, papers, and effects" from "unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment requires adherence to the judicial process by

providing that warrants for searches and seizures shall not be issued without a showing of probable cause. *Katz v. United States*, 389 U.S. 347, 356-57 (1967). Therefore, searches without prior approval by a judge or magistrate, are "per se unreasonable," "subject only to a few specifically established and well-delineated exceptions." *Id.* at 357.

A vehicle stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). "Any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree." *Blair*, 524 F.3d at 748 (internal quotation marks and citations omitted). Officers are justified in conducting warrantless vehicle stops if (1) the officer has probable cause to make a stop for a civil infraction (i.e., traffic violations); or (2) the officer has reasonable suspicion of ongoing criminal activity. *Id.*; *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).

In the instant motion, Defendant argues that Trooper Moore abandoned the purpose of the traffic stop after he checked the driver's licenses and registration and insurance paperwork, and that Moore's mission then impermissibly shifted to detecting evidence of ordinary criminal wrongdoing without reasonable suspicion of criminal activity. Defendant argues that, therefore, the dog sniff and subsequent vehicle search were illegal.

The Government responds that Trooper Moore and Trooper Sinke were justified in stopping and searching the vehicle on the basis of probable cause, given the informant's tip corroborated by the DEA's independent investigation and the geo-location information for Graham's phone, all of which the DEA shared with MSP before the traffic stop. According to the Government, based on the collective knowledge of MSP and the

DEA, Moore and Sinke had more than a reasonable suspicion that Defendant and Brown were engaged in drug trafficking, and had probable cause once the drug-sniffing dog alerted on the vehicle.

Defendant replies that, based on the preliminary examination testimony for the initial state charges, Moore and Sinke were not acting at the behest of the DEA when they stopped the vehicle. Rather, Moore testified that he stopped the vehicle for a traffic violation, and Sinke testified that he arrived on the scene in response to Moore's request to conduct a free-air search of the vehicle.

### A. Whether Moore Developed Reasonable Suspicion During the Traffic Stop, or Impermissibly Acted Beyond the Purpose of the Mission

"[P]olice officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Blair*, 524 F.3d at 748 (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). However, an otherwise lawful seizure on the sole basis of a civil infraction may become unlawful if it is extended beyond the time reasonably required to address the infraction and attend to related safety concerns, and there is no reasonable suspicion to extend it. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see Lyons*, 687 F.3d at 763-64. If an officer develops reasonable and articulable suspicion that criminal activity is afoot during a traffic stop for a civil infraction, he or she may be justified in acting beyond the initial purpose of the stop to detain a motorist and conduct a warrantless search. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

In evaluating the reasonableness of prolonging a vehicle stop, courts look to the totality of circumstances based on the duration and subject matter of the officer's questioning during the stop. *Stepp*, 680 F.3d at 662 (citing *United States v. Everett*, 601

F.3d 484, 494 (6th Cir. 2010)). A traffic stop may include ordinary inquiries incident to that stop, such as checking the driver's license, checking for outstanding warrants, and inspecting insurance and registration documents. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). An officer may also ask context-framing and safety-related questions regarding travel history, travel plans, authority to operate the vehicle, and any dangerous weapons. *Everett*, 601 F.3d at 494-95. Additionally, once a vehicle is lawfully stopped for a traffic violation, an officer may order a driver and/or passenger to exit the vehicle pending the completion of the stop. *Arizona v. Johnson*, 555 U.S. 323, 331-32 (2009). Such inquiries and orders will rarely suggest a lack of diligence on the part of the officer. *Everett*, 601 F.3d at 494-95. Without reasonable suspicion, an officer is also authorized to conduct investigations that are unrelated to the purpose of the traffic stop, such as a canine search, if they occur during the traffic stop and do not prolong it. *Rodriguez*, 135 S. Ct. at 1614; *Lyons*, 687 F.3d at 764.

Officer may develop reasonable suspicion or probable cause to search a vehicle during a traffic stop based on the officer's interactions with the vehicle's occupants. *Lyons*, 687 F.3d at 764.

> Reasonable suspicion must be considered under the totality of the circumstances, considering all of the information available to law enforcement officials at the time. Officers are entitled to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Pertinent circumstances include the officer's own direct observations, dispatch information, [and] directions from other officers . . . . [Courts] must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

*Id.* at 763.

Factors that prompt reasonable suspicion vary on a case-by-case basis and a combination of factors simultaneously present is usually required. In *United States v. Hill*, the Sixth Circuit found that nervous demeanor, inconsistent travel plans, implausible explanations for a trip, cash rental of a U-Haul truck, and the possibility that at least one passenger was doing drugs was a sufficient basis for reasonable suspicion of criminal activity. *Hill*, 195 F.3d at 270-72. Factors like the ones noted may be weak indicators of criminal activity when standing alone. For example, nervousness alone is not a reliable indication of criminal activity; however, nervousness could reasonably arouse suspicions of criminal activity if combined with other factors. *See Richardson*, 385 F.3d at 630-31. Courts review alleged suspicious behavior under a "common sense approach, as understood by those in law enforcement." *Id.* at 630.

In the present case, putting aside the directions from the DEA to MSP to conduct a traffic stop, Trooper Moore lawfully stopped the vehicle that Defendant was driving for tailgating, a traffic violation. At the preliminary examination, Moore testified that, based on his training and experience and the totality of the circumstances he observed, he believed that criminal activity was afoot. The circumstances included the inconsistencies in Defendant and Brown's story about their Chicago trip, their unusually defiant demeanors, Defendant's unusual questions, the furnishing of incorrect registration and insurance documents, Brown's failure to provide his driver's license upon Moore's first request, and Brown's nervousness and shaking hands. Moore also noted a strong odor of air freshener, as well as the fact that Defendant told him he had luggage in the trunk and then told him he had no belongings in the vehicle. Moore testified that after checking the licenses and documents he asked Defendant to exit the vehicle in order to get

clarification on the inconsistent story about their trip to Chicago and how long they had stayed there. Instead of clarifying, Defendant appeared rehearsed and asked, "Is this a regular traffic stop?" and, "Why can't you just give me a ticket?" Moore testified that he has never in his 20+ years as an officer received such questions in response to his inquiries about where people are going, where they have been, and how long they have been gone. Moore then asked if Defendant had anything illegal in the vehicle and if he would consent to a search. Defendant responded that he did not, and he denied consent to a search. Under the totality of the circumstances, considering all of the information available to Moore taken as a whole, and recognizing that Moore was entitled to draw on his training and experience as an officer, the Court concludes that the aforementioned factors give rise to reasonable suspicion of criminal activity.

As Moore was asking Brown to exit the vehicle to begin to individually question him about the inconsistencies regarding the Chicago trip, Trooper Sinke responded to Moore's request, and the dog conducted a free air sniff of the vehicle's perimeter and alerted on the vehicle. Moore's inquiries discussed above were permissible and reasonably required to address the traffic violation and attend to related safety concerns. None of his questions or directives suggested a lack of diligence on his part, and he had not completed his mission by the time that Sinke arrived with the K-9 unit. See *Everett*, 601 F.3d at 495 (noting that officers are not required to move at "top speed," and that some amount of questioning is permissible "so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop"). The Court finds that the free air sniff of the vehicle's perimeter, although unrelated to the traffic violation, did not impermissibly prolong the

traffic stop (even if Moore had not yet developed reasonable suspicion of criminal activity). The fact that Moore requested the K-9 unit is of no moment, as making that request did not prolong the traffic stop. An officer may conduct investigations that are unrelated to the purpose of the traffic stop, such as a canine search, if they occur during the traffic stop and do not prolong it. *Rodriguez*, 135 S. Ct. at 1614; *Lyons*, 687 F.3d at 764. In any event, even if Moore's mission had ended by the time Sinke arrived with the K-9 unit, Moore had by then developed reasonable suspicion under the totality of the circumstances, as discussed above. And once the dog alerted on the vehicle, the officers had probable cause to search the vehicle.

### B. Whether Moore had Reasonable Suspicion or Probable Cause to Stop and Search the Vehicle Based on the DEA's Investigation

Alternatively, the Government argues that Moore had probable cause, or at least reasonable suspicion, to stop and search the vehicle given the informant's tip corroborated by the DEA's independent investigation and the geo-location information for Graham's phone, all of which the DEA shared with MSP before the traffic stop. The Court agrees.

As discussed above, an officer must have either probable cause of a civil infraction or reasonable suspicion of criminal activity to effect a traffic stop. *Lyons*, 687 F.3d at 763. "Reasonable suspicion must be considered under the totality of the circumstances, considering all of the information available to law enforcement officials at the time." *Id.* (internal quotation marks and citations omitted). "The degree of a traffic stop's intrusion must be reasonably related in scope to the situation at hand, as judged by examining the reasonableness of the officer's conduct given his suspicions and the surrounding circumstances." *Id.* at 764.

Reasonable suspicion may ripen into probable cause to search a vehicle based on the officer's interactions with the vehicle's occupants during a traffic stop. *Id.* Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). The probable cause test is whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Lyons*, 687 F.3d at 764. A detailed tip from an informant and an officer's independent corroboration of the tip sufficiently establishes probable cause to conduct a warrantless search of a readily mobile vehicle. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *United States v. Padro*, 52 F.3d 120, 123-24 (6th Cir. 1995).

In the present matter, the DEA received a tip from a confidential informant that had been successfully used before and deemed reliable. The confidential informant told the DEA that Chandler, a suspected drug trafficker who was the subject of an ongoing, long-term DEA investigation, planned to purchase a large quantity of cocaine in Phoenix, to be transported in a car with a secret compartment. DEA agents worked to corroborate the tip, investigating the social media pages of Chandler's associates, which revealed discussions and photographs denoting travel to Phoenix. DEA agents were then able to locate the suspected drug couriers at the Embassy Suites Hotel in Phoenix. Defendant was seen on hotel surveillance footage reviewed by the DEA agents. The DEA then obtained a search warrant for the location of the phone used to check in at the hotel, a phone which had been in communication with another target cellphone number believed to be used by Chandler. The DEA agents reviewed the electronic surveillance and geo-location information pertaining to this phone as it approached Michigan. The DEA group

supervisor then contacted MSP Trooper Jose Patino to inform him of the investigation and findings from the phone's geo-location and asked MSP to perform a traffic stop. The Court finds that the DEA had at least reasonable suspicion to stop and search the vehicle, based on the reliability of the confidential informant, the level of detail provided by the informant, and the independent corroboration of the tip.

Defendant asserts, however, that Trooper Moore had no knowledge of the DEA investigation. The Government argues that Trooper Moore had at least reasonable suspicion based on the collective knowledge of the investigating agents and officers.

> It is well-established an officer may conduct a stop based on information obtained by fellow officers. Variously called the "collective knowledge" or "fellow officer" rule, this doctrine recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another. Because officers must often act swiftly and cannot be expected to cross-examine their fellow officers about the foundation of transmitted information, we impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop. Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion. By imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine preserves the propriety of the stop and avoids crippling restrictions on our law enforcement.

*Lyons*, 687 F.3d at 766. A traffic stop based on collective knowledge must nevertheless be supported by a proper basis and reasonably related in its scope to the specific situation. *Id.*

In *Lyons*, as in the instant case, the defendant was arrested after two MSP troopers discovered narcotics in her vehicle during a traffic stop requested by the DEA. 687 F.3d

at 759. Finding that there was no evidence in the record that the MSP troopers stopped the minivan based on the DEA's investigation and collective knowledge, the district court suppressed the evidence. *Id.* at 762. The Sixth Circuit reversed finding that the requisite relationship was established when the investigating DEA agent spoke to MSP and informed them of the DEA's investigation. *Id.* at 767-69 ("The troopers possessed all the information they needed to act — a reasonable request by the DEA (subsequently found to be well-supported) that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle . . . [T]he lack of detail reflected in the trooper's testimony was perhaps understandable given the urgency of the circumstances.") The court found (1) that the officer making the stop acted in objective reliance on the information received; (2) that the officer providing the information had facts supporting the level of suspicion required; and (3) that the stop was no more intrusive than would have been permissible for the officer requesting it. *Id.* The Sixth Circuit also found that the DEA had reasonable suspicion of criminal activity when they contacted MSP based on DEA surveillance that was informed by a "significant and specific investigatory context." *Id.* at 764 (noting that on the date of the defendant's arrest, the suspected organization had been under federal investigation for fifteen months).

In the present matter, the record shows that, once the surveillance showed that the phone was approaching Michigan, the DEA group supervisor contacted MSP to inform MSP of the DEA investigation and findings from the phone's geo-location, and to ask MSP to perform a traffic stop. Defendant makes much of the fact that Trooper Moore did not mention the DEA investigation during the March 2015 preliminary examination in state court. However, Chandler, the suspected leader of the drug trafficking organization and

someone who had already escaped arrest once, had not yet been indicted in this case and was still under investigation. *See Lyons*, 687 F.3d 754 at 760-61 (noting that the DEA requested that MSP develop independent probable cause for the stop because the DEA did not want its lead targets tipped off that the organization was under federal investigation, and noting that the MSP incident report did not mention the DEA's investigation or the DEA agent's instructions). The Court concludes that, as in *Lyons*, Trooper Moore acted in reliance on the information received from other MSP officers that had been in communication with the DEA regarding this long-term investigation and related surveillance earlier that morning, and that Trooper Moore had the information that he needed to stop and search the vehicle — a reasonable and well-supported request by the DEA to make a traffic stop in the expectation that illegal narcotics would be found in the vehicle. As discussed above, the Court further finds that the DEA had facts supporting at least reasonable suspicion, and that the stop was no more intrusive than would have been permissible for the investigating DEA agents. A canine search was related to the purpose of this stop, and once the dog alerted on the vehicle, sufficient probable cause was established to justify the warrantless search of the vehicle. *See Hill*, 195 F.3d at 273.

The Court concludes that Defense Counsel's performance with regards to any motion to suppress was reasonable because such a motion would not have been successful. In sum, Defendant has not met his burden of proving that Defense Counsel's performance was so deficient or that prejudice resulted from failure to file such a motion.

### V.   CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11 of the Rules

Governing Section 2254 and 2255 Proceedings requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citations omitted).

For the reasons stated in this opinion, the Court will deny Defendant a certificate of appealability because he has failed to make a substantial showing that his constitutional rights were compromised.

## VI. CONCLUSION

Based upon the foregoing, IT IS ORDERED that the petition for post-conviction relief is DENIED WITH PREJUDICE. IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: July 10, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 10, 2018, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager